Filed 2/23/24  In re R.G. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | C098371 |
| THE PEOPLE, | (Super. Ct. No. JV141161) |
| Plaintiff and Respondent, | |
| v. | |
| R.G., | |
| Defendant and Appellant. | |

Sixteen-year-old minor R.G. shot and killed one person and injured another in June 2014.  A jury found him guilty of second degree murder and found various enhancements true.  In his first appeal, another panel of this court conditionally reversed the judgment and remanded the case for a juvenile transfer hearing pursuant to Welfare and Institutions Code section 707.[1]  On remand, the juvenile court granted the People's

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

petition to transfer R.G. to a court of criminal jurisdiction.  R.G. contends the juvenile court's findings were not supported by substantial evidence.  We will affirm.

I

BACKGROUND

R.G. and 17-year-old E.G. were Norteño gang members.  A short distance from the victim's home, R.G. climbed onto the handlebars of a bicycle piloted by E.G.  R.G. had a rifle and a handgun, while E.G. had a handgun.  E.G. pedaled the bicycle to the front of Roy Ravana's home where Ravana and his friend K.O. were out front doing yard work.  Ravana and K.O. were members of the Tongan Crip gang, a rival gang to the Norteños.  (*People v. R.G.* (Feb. 6, 2020, C083218) [nonpub. opn.] (*R.G.*).)

E.G. fired his handgun toward Ravana and K.O. from the bicycle, while R.G. fired the rifle on foot next to the bicycle.  When R.G. and E.G. opened fire, Ravana ran inside and came back with a "Uzi" submachine gun and returned fire.  In the exchange of gunshots, one bullet killed Ravana and another bullet injured K.O.  After Ravana collapsed in the street, R.G. and E.G. moved away from the home while still firing at the victims.  (*R.G., supra*, C083218.)

When detectives arrived, they found R.G. and E.G. trying to put the rifle in R.G.'s pants.  The detectives took R.G. and E.G. into custody.  R.G. had a rifle, three magazines loaded with rifle ammunition, a nine-millimeter semiautomatic handgun, and a red bandana.  E.G. was holding a cell phone, had a .357 magnum revolver, and was wearing clothing indicating his membership in the Norteño gang.  The police found 36 expended shell casings on the ground near Ravana's home.  (*R.G., supra*, C083218.)

A nine-millimeter handgun was connected to two shootings in the month prior to the killing.  In the first shooting, a gun of the same caliber was fired twice near a local television station.  Witnesses saw two Hispanic males on a bicycle or bicycles near the station.  In the second shooting, a nine-millimeter gun was used to fire 13 rounds into a

local market.  Text messages from E.G. implicated R.G. and E.G. in both of these earlier shootings.  (*R.G., supra*, C083218.)

Ballistics evidence also connected R.G.'s nine-millimeter handgun with yet two more shootings.  In the first, the gun was used to fire five rounds in the neighborhood.  In the second shooting, the gun was used to fire 10 rounds at the home across the street from Ravana's home.  (*R.G., supra*, C083218.)

The jury found R.G. guilty of second degree murder.  (Pen. Code, § 187, subd. (a).)  The jury also found true various enhancement allegations.  The trial court sentenced R.G. to an aggregate indeterminate term of 40 years to life in state prison.  On direct appeal, a different panel of this court modified the judgment to strike the gang enhancements, conditionally reversed the modified judgment, and remanded the case to the juvenile court for a juvenile transfer hearing.  (*R.G., supra*, C083218.)

On remand, the People filed a juvenile wardship petition and sought to have the case transferred to the jurisdiction of the criminal court.  At the hearing on the transfer petition, the People read into the record the victim's impact statement provided by Ravana's mother.  The People also submitted 26 exhibits documenting the facts of the crime, victim impact statements, reports concerning the uncharged shootings, and disciplinary reports of R.G.'s misconduct while in custody.  We will summarize the relevant disciplinary reports, *post*.

R.G. presented the testimony of a social worker who had known him for five years preceding the murder.  The social worker described R.G. as caring, kind, respectful, and well-behaved.  R.G.'s mother suffered from severe mental illness that led to instability in R.G.'s family.  R.G. struggled developmentally and with school stability.  The social worker testified R.G. had told her he was bullied at school by his peers.  R.G. lived in a low-income, poverty-ridden neighborhood and there was domestic violence and sexual abuse in his home.  During his young life, R.G. lost his house twice due to house fires.

3

R.G. also presented the testimony of a witness who had known him for approximately 10 years through his participation in an Aztec dance group. The witness echoed the social worker's testimony about R.G.'s chaotic housing situation, the house fires, and his mother's mental illness. She testified that R.G.'s father was in and out of jail during R.G.'s life.

R.G. testified on his own behalf. His mother had mental and physical health issues and disabilities and he did not really know his father who was in prison most of R.G.'s life. R.G. testified his father used methamphetamine, drank, and "smoke[d] dope." R.G.'s father and mother regularly fought, and his father abused his mother. R.G. thought of school as an escape from home, but R.G. would get into fights at school because he was bullied for having a speech impediment.

R.G. testified his house burned down when he was 15 years old and that is when he hit rock bottom and started smoking weed, taking drugs, and drinking. His mother went into a shelter, but the shelter would not house him, so he began to sleep on whatever couch he could find. He felt useless and worthless.

R.G.'s family was involved in gangs, including his father, brothers, and uncles. While R.G.'s brother was in prison his brother wrote to him and told R.G. he was destined to go to prison. His brother also told R.G. that if someone asked R.G. to stab someone else while in prison, he should do it. R.G.'s brother claimed he had been stabbed when he refused an order to stab another inmate.

R.G. told the juvenile court he tried to get in touch with his victim's mother to tell her he was trying to be a better person. In this regard, R.G. obtained his high school GED, was in college, and completed some self-help programs. R.G. testified he was unable to get into any rehabilitation programs while he was awaiting trial and was not automatically considered after he was placed in the Department of Corrections and Rehabilitation (CDCR) due to his status as a lifer. Despite these barriers, R.G. completed an anger management program. He was also unable to participate in any programs when

4

he was in the special housing unit for 32 months for stabbing his fellow inmate. When he returned from the special housing unit, he enrolled in and completed multiple rehabilitation classes on a correspondence basis. On cross-examination, R.G. admitted he engaged in only two rehabilitative programs prior to receiving this court's prior opinion directing that the case be transferred to juvenile court.

R.G. addressed the murder and two other convictions during direct examination. As to the murder, R.G. claimed he had some guns in his house, and he was taking them to another house to try to sell them. As they were taking the guns from the house, R.G. claimed the victims chased him down the street and fired at him. On cross-examination, R.G. admitted he did not tell this story to the police when initially questioned.

As to the two convictions while in custody, R.G. claimed he stabbed an inmate because he was told to do so by another inmate. He followed that order because he did not want to be stabbed himself. He justified his possession of a weapon convictions because he needed a knife to protect himself in prison.

On cross-examination, the prosecutor walked R.G. through each of his disciplinary write-ups while he was in custody. R.G. got into a fight with another resident within one month of being locked up in juvenile hall and had many disciplinary write-ups until he was released to the main jail pending trial. There were over 100 different incidents, most of which were for being disrespectful to other residents and staff. The more serious of these write-ups are specifically described in the juvenile court's findings, *post*. R.G. received disciplinary write-ups in the main jail and at CDCR. These are also summarized in the juvenile court's order, *post.*

Despite R.G.'s claim he was not in a gang, he admitted he was housed as a Norteño in juvenile hall, the main jail, and at CDCR. He wrote gang graffiti on his door, threw gang signs, and yelled gang slurs from his room while he was in juvenile hall. R.G. also admitted he had documents in his main jail cell that only a Norteño would be given.

5

As to one of the uncharged shootings, R.G. said the other person flashed gang signs at him. R.G. flashed gang signs back and when the other person came at him, he told E.G. to shoot, and pulled out his own gun and fired. Regarding the second shooting, R.G. claimed the victim asked him if he gang banged. R.G. reported he saw the victim had a gun, so R.G. preemptively shot at him.

The juvenile court issued a 13-page decision granting the motion transferring the case to the criminal court. In that decision, the juvenile court identified the test set forth in section 707, the proper standard of proof, and the five criteria it was required to analyze, including the requirements under each criterion. The juvenile court concluded the circumstances and gravity of the offense and R.G.'s amenability to rehabilitation weighed in favor of granting the motion, while the criteria related to criminal sophistication, delinquent history, and prior rehabilitative efforts weighed in favor of denying the motion. When the juvenile court considered all five criteria together, it found the People had met its burden by clear and convincing evidence that R.G. was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

Three of the criteria did not support the motion to transfer. First, while there was some evidence R.G. was criminally sophisticated, there was significant mitigating evidence stemming from his upbringing and his environment that counseled against finding criminal sophistication. The juvenile court also found R.G.'s juvenile justice history prior to this crime was insignificant and his chaotic life contributed significantly to his misbehavior in custodial settings. R.G. had received no rehabilitative services while under the jurisdiction of the juvenile court, thus, the success of prior juvenile court rehabilitation attempts counseled against transferring the matter.

But the juvenile court found the last two criteria did support transfer. On the criterion of the gravity of the offense, the juvenile court recited the facts of the crime and the four uncharged shootings. The court noted R.G.'s version of the murder was contrary

6

to the evidence at trial and his exculpatory descriptions of the other shootings defied common sense.

As to the criterion of amenability for rehabilitation while under the juvenile court's jurisdiction, the juvenile court reviewed R.G.'s extensive custody discipline record over the nine years he had been incarcerated. The juvenile court credited R.G.'s efforts at rehabilitation courses but found his work on those courses had no discernible impact on reducing his serious acts of violence.

While in the juvenile hall between 2014 and 2016, R.G. was involved in nine serious disciplinary incidents. These included possessing contraband, writing gang graffiti, fighting, threatening a teacher, and attacks on other residents, including stomping the back of the head of one resident and smashing his head into the concrete for which R.G. admitted he committed assault in violation of Penal Code section 245.

During his time at the main jail during 2016, and between 2021 and 2023, R.G. engaged in seven serious misconduct incidents. Twice he punched his cellmate and the second time he left his victim with a broken lower spine and nose. R.G.'s write-ups also included fighting, possession of marijuana, possession of a toothbrush with a razor melted into its tip, and being under the influence.

While confined by the CDCR, R.G. committed two felonies. In one, he stabbed another inmate with a manufactured knife and pled guilty to assault of an inmate with a deadly weapon causing great bodily injury. (Pen. Code, § 4501, subd. (a).) In the other, he had a plastic shank in his pocket with a metal tip and officials found a knife at his feet; R.G. pled guilty to possession of a weapon by an inmate. (Pen. Code, § 4502, subd. (a).)

The juvenile court found R.G.'s self-serving testimony that he was not a gang member disingenuous in light of overwhelming evidence of his gang ties and acts. At his CDCR orientation, he told the intake officers he was a Norteño from Sacramento. He had possession of documents in his cell entrusted only to Norteño members. Further, he tried to recruit one of his cellmates into the gang.

The juvenile court rejected R.G.'s claim he only carried out violence on the orders of others given the many false exculpatory claims R.G. made throughout the proceedings. The juvenile court also discounted Dr. Eugene Roeder's 2016 evaluation of R.G. that concluded R.G. was not impulsive, egotistical, oppositional, or predisposed to delinquency. Instead, Dr. Roeder claimed R.G. presented as "depressed, inhibited, doleful and submissive, with significant levels of peer insecurity and someone who has been affected by his childhood abuse." Dr. Roeder went on to state if R.G. was able to "take advantage of the opportunities available to him through [CDCR], he has good potential for developing a much more healthy adult adjustment than was present at the time of this evaluation, and his prognosis for someday being successful on a grant of parole would then become positive." The juvenile court gave Dr. Roeder's opinion little weight because Dr. Roeder did not have R.G.'s record of violent misconduct since the date of that report.

Based on its evaluation of the relevant factors, the juvenile court granted the motion to transfer the matter to a court of criminal jurisdiction. R.G. filed a timely notice of appeal with this court in April 2023. His opening brief was filed in September 2023, and this case was fully briefed on January 29, 2024.

II

DISCUSSION

R.G. argues the juvenile court's decision to transfer him was not supported by substantial evidence. Specifically, R.G. argues the court failed to consider "anything regard[ing] R.G.'s mental state at the time of the shooting, or his mental and emotional development during the time just prior to and during the shooting." As to the factor of R.G.'s amenability to rehabilitation, R.G. argues the juvenile court fell short of the Legislature's intent in the recent change to the juvenile law. We disagree.

Section 707, subdivision (a)(1) allows prosecutors to move to have a minor who is 16 years or older transferred from the jurisdiction of a juvenile court to criminal court

8

when the minor is alleged to have committed one of a list of criminal offenses. The enumerated offenses include murder. (§ 707, subd. (b)(1).)

Effective January 1, 2023, the Legislature amended section 707, requiring that "[i]n order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); Stats. 2022, ch. 330, § 1.) It also added a requirement that the juvenile court "include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (*Ibid.*)

In rendering its decision, the court must consider the five specified criteria the juvenile court considered in this action: (1) the "degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "the minor's previous delinquent history"; (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3).)

The People's burden is to prove the minor is not amenable to rehabilitation while under the juvenile court's jurisdiction by clear and convincing evidence. (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284.) "The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998; see also Evid. Code, § 115.)

"[T]he fundamental question before an appellate court reviewing for sufficiency of the evidence is the same, regardless of the standard of proof that applied below: whether any reasonable trier of fact could have made the finding that is now challenged on appeal." (*Conservatorship of O.B., supra*, 9 Cal.5th 989, 1005.) "[W]hen presented with

9

a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Ibid.*, fn. omitted.) In other words, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.) In so doing, we "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

### A.    *Gravity of the Offense*

R.G. argues the juvenile court erred in considering the criterion of the gravity of the offense because it failed to consider "anything regard[ing] R.G.'s mental state at the time of the shooting, or his mental and emotional development during the time just prior to and during the shooting." In evaluating this criterion, the statute directs the juvenile court to "give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

We conclude the juvenile court adequately reviewed the gravity of the offense and substantial evidence supports its finding that this criterion supported transfer. The juvenile court recited the facts of the crime, R.G.'s behavior, R.G.'s degree of involvement in the crime, and the level of harm R.G. caused in this unprovoked shooting that left one person dead and another injured. The court considered the proffered mental state of R.G. in his claim he was acting in self-defense during the murder and two of the shootings. But the juvenile court rejected R.G.'s claims in light of the evidence presented

10

at trial and based on its finding that R.G.'s exculpatory versions of the two other shootings did not make sense.

The juvenile court conducted the review the statute requires and gave weight to the factors it deemed relevant. To the extent R.G. argues the juvenile court should have considered other matters, R.G. is attempting to turn the list of relevant factors the court may consider into a list it *must* consider. That is not what the plain language of the statute requires.

We also note that the juvenile court expressly considered R.G.'s emotional health at the time of the offense and the effect of his environment and childhood trauma when it examined R.G.'s criminal sophistication. There, the court noted significant mitigating evidence stemming from the subject's upbringing and environment. The juvenile court acknowledged R.G.'s mother's serious and chronic mental illness, leaving R.G. to fend for himself. The juvenile court noted that R.G.'s housing was unstable, his family was without adequate resources, and his neighborhood was plagued by violence and gang activity. Under these circumstances, the court acknowledged R.G.'s upbringing was chaotic, and this chaos contributed to his gang affiliations and firearm violence. Thus, we conclude the juvenile court's analysis of the gravity of the offense was proper and supported by substantial evidence.

B.    *Rehabilitation While Under the Juvenile Court's Jurisdiction*

Under this claim of lack of substantial evidence, R.G. argues the juvenile court's recitation of R.G.'s lengthy record of misconduct in prison, his limited attempts at rehabilitation, and his lack of credibility "misses the point of this criterion and falls short of the Legislature's intent in the recent changes in juvenile law." We disagree.

"When evaluating the criterion [of whether a minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction], the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)

11

Here, R.G.'s argument does not attack the juvenile court's conclusion the People established he did not have potential to grow and mature and could be rehabilitated within the time left in the juvenile court system. To the extent R.G. did not make this argument below it is forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 351.)

R.G.'s argument suggests evidence of his actual track record in prison and credibility should not be relied upon to determine whether he is amenable to rehabilitation. We disagree and conclude the juvenile court's finding that R.G. could not be rehabilitated in the time he had left in the juvenile justice system (he was 25 years two months old as of the time of the hearing and 26 as of the date of this opinion) is supported by substantial evidence. As a result, we have no occasion to further delve into the legislative intent underlying the express language of the statute.

R.G. presented himself as having made serious attempts at rehabilitation, including evidence of his obtaining his GED, taking college classes, and taking multiple correspondence rehabilitation courses. Against this backdrop, however, R.G. again and again engaged in violent misconduct and continued his gang affiliations in prison. He engaged in fights. He punched people. He stabbed an inmate. He stomped a resident's head and smashed his face into the ground. He broke another cellmate's spine and nose while trying to recruit him into a gang. He identified as a gang member and engaged in gang activities. He pled guilty to assault with a deadly weapon and possession of a weapon in prison. Further, R.G. made false statements about his culpability in the instant murder and assault. He attempted to deflect blame for the uncharged shootings with baseless claims. R.G.'s nine-year history of violence coupled with his lack of credibility is substantial evidence under the clear and convincing standard that supports the juvenile court's finding that R.G. could not be rehabilitated while in the juvenile justice system.[2]

---

[2] We are cognizant of this court's decision in *In re S.S., supra*, 89 Cal.App.5th at page 1291, in which we noted that "this criterion generally requires 'expert testimony

We conclude the juvenile court's findings support the transfer of R.G. to a court of criminal jurisdiction by clear and convincing evidence. (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116 ["The weight to be given each of these factors is within the court's discretion"].

DISPOSITION

The judgment is affirmed.

> /s/
> BOULWARE EURIE, J.

We concur:

/s/
DUARTE, Acting P. J.

/s/
WISEMAN, J.*

---

concerning the programs available, the duration of any of the programs, or whether attendance would rehabilitate [the minor] before termination of the juvenile court's jurisdiction.' " We are also cognizant the juvenile court's jurisdiction over R.G. could be retained for a period if discharging him "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior." (§ 1800, subd. (a).) R.G. did not raise the lack of expert testimony on this point. This appears to be one of the rare cases in which expert witness testimony was not necessarily required on this subject given R.G.'s nine-year history of violence while in custody, strong gang ties to the Norteño gang, and the juvenile court's unchallenged findings that R.G. lacked credibility.

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.